**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MIRIAM GONZALEZ,   :
    :
           Plaintiff,   :
    :   <u>MEMORANDUM DECISION</u>
   -against-   :   <u>AND ORDER</u>
    :
UNITED STATES OF AMERICA,   :   17 Civ. 3645 (GBD) (OTW)
    :
           Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

On June 17, 2019 and July 10, 2019, this Court held a bench trial in this action brought by Plaintiff Miriam Gonzalez against Defendant United States of America in its capacity as the administrator of the Department of Veterans Affairs, which owned and operated a hospital where Plaintiff's now-deceased husband, Robert R. Salazar, received medical treatment. (*See* Trial Tr., ECF Nos. 115, 121.) Plaintiff asserts claims under the Federal Tort Claims Act (the "FTCA"), alleging that the Government, through the hospital's employees, negligently failed to diagnose Salazar with lung cancer based on chest x-rays performed on October 7, 2015, resulting in a ten-month delay in diagnosis. (Second Am. Verified Compl., ECF No. 79-1.)

This Memorandum Decision and Order constitutes this Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. This Court finds for Plaintiff and awards damages in the amounts indicated below.

## I.   PROCEDURAL HISTORY

Plaintiff Gonzalez and Salazar commenced this action on May 19, 2017 against the Government, as well as against VA New York Harbor Healthcare System, Saleem R. Ali, M.D., and Robert A. Hessler, M.D. (Compl., ECF No. 15.) On June 26, 2017, Plaintiff and Salazar filed a first amended complaint, asserting claims against the Government only. (Am. Verified Compl.,

ECF No. 18.) Trial was scheduled to begin on September 4, 2018. (*See* Minute Entry dated July 11, 2018.) However, on August 28, 2018, Salazar passed away, and trial was adjourned to provide Plaintiff time to seek appointment as executrix of Salazar's estate. (*See* Gary A. Barbanel's Letter dated Aug. 28, 2018, ECF No. 61; Scheduling Order, ECF No. 62.) On February 22, 2019, with leave of this Court, Plaintiff filed a second amended complaint reflecting that she was now bringing suit as executrix of Salazar's estate as well as on her own behalf and adding a wrongful death claim. (Second Am. Verified Compl.; *see also* Order, ECF No. 76.)

This Court held a two-day bench trial on June 17, 2019 and July 10, 2019. The Government conceded prior to trial that it owed a duty to Salazar and that the failure to diagnose Salazar with lung cancer in or around October 2015, resulting in a ten-month delay in diagnosis, was a departure from the standard of care. (Joint Pretrial Order ("JPTO"), ECF No. 53, § III.B, ¶ 1.) Accordingly, the sole issues to be decided at trial were whether the ten-month delay in diagnosis was the proximate cause of Salazar's injuries and death and, if so, the damages to be awarded. Plaintiff called four witnesses in her case-in-chief, including herself and Dr. Kwang Myung, the radiologist who reviewed chest x-rays performed on Salazar on October 7, 2015 and August 17, 2016; Nurse Practitioner ("NP") Catherine Glasser, who served as Salazar's primary care provider from October 2015 through August 2016; and Dr. Edward Gelmann, Plaintiff's expert witness in medical oncology. (*See* JPTO § VI, ¶¶ 8, 14–15, 36; Joint Letter dated June 12, 2019, ECF No. 110, § VII.A, ¶ 4.) The Government called in its case-in-chief its own expert witness in medical oncology, Dr. Ashish Saxena. (*See* JPTO § VII.B, ¶ 1; Joint Letter dated June 12, 2019 § VII.B, ¶ 1.)

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 52(a) provides, in relevant part, that a court conducting a bench trial "must find the facts specially and state its conclusions of law separately," and that "[j]udgment must be entered under Rule 58." Fed. R. Civ. P. 52(a)(1). Rule 52(a) further provides that such "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6).

## III. FINDINGS OF FACT

### A. Salazar's Diagnosis.

On October 7, 2015, Salazar was an emergency room patient at a hospital that is part of the Department of Veterans Affairs New York Harbor Healthcare System (the "VA"). (JPTO § VI, ¶ 4.) During this visit, Dr. Robert Hessler examined and ordered chest x-rays of Salazar. (*Id.* ¶¶ 6–7.)

Dr. Myung reviewed the results of the chest x-rays that same day.[1] (*Id.* ¶ 8.) As Dr. Myung testified at trial, upon reviewing the results, he found an abnormality in Salazar's lung. (Trial Tr. at 36:11–16 (Myung).) Specifically, as Dr. Myung noted in his report, the posterioranterior ("PA") view, one of the two x-ray views taken, showed "a focal rounded opacity in the right midlung field near the anterior fourth rib," which was "probably representing anterior rib deformity at the costochondral junction possibly due to previous trauma." (JPTO § VI, ¶ 9; Joint Ex. 1 (VA Medical Records) at US_000007.) Dr. Myung testified that this abnormality was an incidental finding, (Trial Tr. at 36:17–24 (Myung)), and was visible on only the PA or back-to-front view,

---

[1] Dr. Myung was an employee of the Government when he treated Salazar, (*id.* ¶ 33), but retired from the VA in March 2019, (Trial Tr. at 24:20–25:1 (Myung)).

but not the lateral or side-to-side view, (*id.* at 37:5–38:2 (Myung)). He also testified that other than this incidental finding, the chest x-rays appeared "normal." (*Id.* at 43:13–24 (Myung).)

Dr. Myung testified that he could not conclude based on the October 7, 2015 x-ray results whether there was abnormality in Salazar's lymph nodes, because chest x-rays "cannot say too much about the lymph nodes." (*Id.* at 47:9–12 (Myung).) He testified that because CT scans are "the first choice to evaluate lymph nodes," he recommended in his report that a CT scan be taken for further investigation. (*Id.* at 46:23–47:4, 50:8–12 (Myung).) Indeed, Dr. Myung's report stated, "Clinical correlation is recommended. If clinically indicated right rib x-ray or a CT scan to rule out a lung nodule." (JPTO § VI, ¶ 9; Joint Ex. 1 (VA Medical Records) at US_000007.)

Dr. Hessler did not make any record in Salazar's medical chart concerning these x-ray results. (JPTO § VI, ¶ 12.) Nor did he order any follow-up testing or inform Salazar's primary care provider of Dr. Myung's recommendation for follow-up. (*Id.*)

Following this October 7, 2015 visit, Salazar began seeing NP Glasser at the VA for his primary care visits. (*Id.* ¶ 14.) As NP Glasser testified, Salazar first saw her on October 13, 2015. (Trial Tr. at 55:23–25 (Glasser).) She testified that during this visit, he had no chest pain, shortness of breath, cardiac or pulmonary symptoms, or other medical problems aside from his diabetes, (*id.* at 66:2–11 (Glasser)), and that based on the medical records, "he was in pretty good shape" "for a 75-year-old man," (*id.* at 67:5–9 (Glasser)). NP Glasser testified that she next saw Salazar on November 30, 2015, and that on that day, his cholesterol and liver value function tests were normal, he had "great improvement in his diabetes control," and he again reported no chest pain, shortness of breath, or other problems. (*Id.* at 68:7–14, 71:12–21, 72:17–22 (Glasser).) She further testified that she "thought he was in pretty good shape" and that she "didn't need to see him again for four months." (*Id.* at 73:2–4 (Glasser).) Accordingly, she next saw Salazar on March 29, 2016. (*Id.*

at 73:5–8 (Glasser).) She testified that his blood pressure, glucose, cholesterol, liver function tests, and lipids were all normal during this visit, and again that he was "in pretty good shape." (*Id.* at 76:3–77:1 (Glasser).) Finally, NP Glasser saw Salazar on August 2, 2016. (*Id.* at 77:2–3 (Glasser).) During this visit, Salazar reported "weight loss, fatigue, and hoarseness, as well as lab abnormalities." (JPTO § VI, ¶ 17.) NP Glasser advised Salazar to get CT scans of his chest and abdomen. (*Id.*) During all of these visits between Salazar and NP Glasser, NP Glasser was unaware of the results of the October 7, 2015 chest x-rays or of Dr. Myung's recommendations for clinical correlation and a possible right rib x-ray or CT scan. (*Id.* ¶ 16.)

On August 17, 2016, Salazar was admitted to the VA hospital "with chief complaints of difficulty breathing, sore throat, and weight loss." (*Id.* ¶ 18.) He underwent chest x-rays, which were reviewed that same day by Dr. Myung. (*Id.* ¶¶ 19–20.) In his report, Dr. Myung noted that "PA and lateral views of the chest x-ray 8/17/2016 as compared to 10/7/2015 demonstrate interval increase in the size of right upper lobe mass lesion. The right hilum is prominent." (*Id.* ¶ 21; Joint Ex. 1 (VA Medical Records) at US_000003.) When asked at trial whether his statement that "[t]he right hilum is prominent" indicated that there was an enlargement of the lymph nodes, Dr. Myung testified that that was "[n]ot necessarily" the case but was "a possibility." (Trial Tr. at 40:25–41:3 (Myung); *see also id.* at 42:18–20 (Myung)).

At trial, Dr. Myung was asked about differences between the August 17, 2016 x-ray results and the earlier October 7, 2015 results. When asked whether he say any enlargement of the hilum in the October 7, 2015 results, Dr. Myung testified that he neither saw any enlargement, nor mentioned the hilum in his report of those earlier x-rays, "which may indicate [that] there was no abnormality related to the hilum." (*Id.* at 42:24–43:12 (Myung).) He also testified that the lung opacity that had been visible only in the lateral view in the October 7, 2015 results was now visible

in both the PA and lateral views in the August 17, 2016 results. (*Id.* at 44:17–45:3 (Myung).) He agreed at trial that the opacity "had grown" and that "there was a big difference." (*Id.* at 45:4–7 (Myung).)

Salazar also underwent on August 17, 2016 a CT scan, which was reviewed that same day by Dr. Serge Somrov. (JPTO § VI, ¶¶ 22–23.) Dr. Somrov reported an impression of "right upper lobe mass, 6.2 x 5.6 cm, lung carcinoma till proven otherwise. Right hilar and subcarinal lymphadenopathy. No evidence for N3 lymphadenopathy. No evidence for distal metastases." (*Id.* ¶ 24.) Subsequently, on August 23, 2016, Salazar had biopsies taken of his lung and lymph nodes, which returned positive for non-small cell lung cancer. (*Id.* ¶ 25.) On August 25, 2016, he was diagnosed with Stage IIIA lung cancer. (*Id.* ¶ 26.)

## B. Salazar's Pre- and Post-Diagnosis Condition and Treatment.

It is undisputed that Plaintiff was married to Salazar. At trial, Plaintiff testified that she first met her husband in 1962 and that they began living together as a couple shortly thereafter. (Trial Tr. at 83:7–14 (Gonzalez).)

Gonzalez testified at trial about Salazar's health and condition both prior to and following his diagnosis with lung cancer. She testified that in March 2016, he was "fine" and "active," (*id.* at 96:8–11 (Gonzalez)), and that NP Glasser told him during his March 29, 2016 primary care visit that he was "doing well," (*id.* at 96:21–23 (Gonzalez)). Plaintiff further testified that during this time, he ran two to three miles several times a week, went to the gym, danced, socialized, traveled, and had an intimate relationship with her. (*Id.* at 97:7–98:6, 100:2–3 (Gonzalez).) According to Plaintiff, there was a "change in [Salazar's] medical condition" around the summer of 2016, at which point Salazar began complaining of muscle aches and fatigue. (*Id.* at 100:11–101:11 (Gonzalez).)

Following his diagnosis with lung cancer in August 2016, Salazar received treatment at, among other places, Memorial Sloan Kettering Cancer Center and the Upper East Side Rehabilitation and Nursing Center. (JPTO § VI, ¶ 29.) Plaintiff testified that around this time, Salazar "was not feeling good, really felt tired, and [had] lack of appetite," and was "getting short of breath [and] beginning to lose his voice." (Trial Tr. at 107:3–17 (Gonzalez).) In September 2016, he was diagnosed with paraneoplastic necrotizing autoimmune myositis, forcing treatment for his cancer to be delayed. (JPTO § VI, ¶ 27.) As Plaintiff testified at trial, in September 2016, Salazar also had a feeding tube inserted, through which she fed her husband, and which remained inserted up until his death. (Trial Tr. at 110:6–20 (Gonzalez).) She further testified that Salazar began radiation therapy in November 2016, (id. at 111:12–24 (Gonzalez)), and that he had 30 radiation treatments, (id at 116:6–8 (Gonzalez)). Salazar was scheduled for 33 treatments, but during the 30th treatment, he began having difficulty breathing and developed a fever. (Id. at 116:10–14 (Gonzalez).) Plaintiff testified that during a three-month period when Salazar was at a rehabilitation center, he "lost his muscle ability to even speak" and "had to be trained to walk," (id. at 110:21–25 (Gonzalez)).

Plaintiff testified that Salazar began receiving chemotherapy in early 2018. (Id. at 116:20–21 (Gonzalez).) She testified that side effects from the chemotherapy included loss of hair and appetite. (Id. at 118:12–22 (Gonzalez).) She further testified that "[t]here came a time that [she] could not leave [him] alone," and that he fell at home on two occasions while trying to get out of bed. (Id. at 119:12–23 (Gonzalez).)

Salazar's lung cancer ultimately progressed to Stage IV, (JPTO § VI, ¶ 32), and he passed away on August 28, 2018 from complications related to the cancer, (Joint Letter dated June 12, 2019 § VI, ¶ 32.)

## C. Causation.

Both parties provided expert opinion testimony from experts in medical oncology: Dr. Gelmann on behalf of Plaintiff, and Dr. Saxena on behalf of the Government. The experts' testimony, along with other evidence at trial, established that lung cancer is staged based on three metrics: (1) the "T category," or the size of the tumor, (2) the "N category," or whether the cancer has spread to nearby lymph nodes, and (3) the "M category," or whether the cancer has metastasized and spread to other organs. (Trial Tr. at 156:12–24 (Gelmann); Trial Tr. at 196:17–200:15 (Saxena).) The experts' testimony also established that x-rays alone are inadequate to determine whether cancer has spread to lymph nodes. Specifically, Dr. Gelmann testified that there could be lymph node involvement that is not visible on an x-ray, and that it is therefore not possible to rule out lymph node involvement based on an x-ray alone. (Trial Tr. at 178:23–179:15 (Gelmann).) Dr. Saxena similarly testified that x-rays are not "a reliable way" to assess lymph node involvement because lymph nodes "are not clearly seen on an x-ray." (Trial Tr. at 199:22–200:3 (Saxena).)

Dr. Gelmann and Dr. Saxena were both questioned about Salazar's October 7, 2015 chest x-rays. Dr. Gelmann testified that based on the x-rays, Salazar's cancer at the time was Stage I, or "T1N0M0," with "T1" meaning that the tumor was less than three centimeters, "N0" meaning that there was no lymph node involvement, and "M0" meaning that the cancer had not spread to any organ. (Trial Tr. at 161:3–10, 177:16–178:2 (Gelmann).) He noted that Dr. Myung's report of those x-rays did not identify any enlarged lymph nodes in the two areas that were "subsequently known to be involved with [Salazar's] cancer in 2016." (*Id.* at 161:11–15 (Gelmann).) Dr. Saxena testified that one cannot "reliably" determine the stage of Salazar's cancer using only the October 7, 2015 x-rays, (Trial Tr. at 194:9–11 (Saxena)), and that he could not opine on the exact stage of

the cancer at that time, (*id.* at 249:20–250:1 (Saxena)). He testified, however, that there was "a good chance" that it was less than Stage III. (*Id.* at 250:6–14 (Saxena).) He later reiterated that there was, "based on reasonable medical certainty," a "good likelihood that it was less than stage 3." (*Id.* at 276:22–277:6 (Saxena).)

Dr. Gelmann and Dr. Saxena agreed that treatment depends on the stage of the cancer. (Trial Tr. at 157:14–158:2 (Gelmann); Trial Tr. at 209:18–215:18 (Saxena).) Dr. Gelmann testified that had Salazar been diagnosed with Stage I lung cancer in October 2015, he would have had surgery to remove the tumor and lymph nodes, (Trial Tr. at 165:18–166:5 (Gelmann)), and, assuming that the cancer did not recur, would not have undergone chemotherapy or radiation, (*id.* at 173:1–6 (Gelmann)). Dr. Gelmann additionally testified that if Salazar's cancer had not progressed, Salazar would have "more likely than not" avoided developing paraneoplastic autoimmune syndrome, which had weakened Salazar's muscles, thereby causing him to develop a heart condition and rely on a feeding tube. (Trial Tr. at 164:18–165:17, 166:16–21 (Gelmann).) Dr. Saxena similarly testified that the standard treatment for Stage I cancer is surgery, and that chemotherapy typically is not given. (Trial Tr. at 211:16–24 (Saxena).) He testified that "[f]or those patients who are treated for clinical stage 1 whose cancer has not upstaged to a higher stage, . . . the rate of recurrence of their cancer . . . can be as high as 40 percent." (*Id.* at 213:19–23 (Saxena).) He further testified that the standard treatment for Stage II and III cancer is chemotherapy in combination with surgery and/or radiation. (*Id.* at 209:18–210:2, 210:16–211:7 (Saxena).) According to Dr. Saxena, if in October 2015 Salazar had undergone treatment, and if such treatment "was unsuccessful and his cancer was present again or never was able to be removed, then he would be at risk of developing paraneoplastic syndrome." (*Id.* at 225:15–23 (Saxena).)

9

As to prognosis, Dr. Gelmann testified that with Stage I cancer in October 2015, Salazar "had a reasonable chance of cure." (Trial Tr. at 166:13–21 (Gelmann).) Pointing to statistics from the National Cancer Institute, Dr. Gelmann testified that with "full staging," individuals with Stage I cancer have a 57 to 60 percent cure rate. (*Id.* at 166:22–167:10 (Gelmann).) When asked about Salazar's case in particular, Dr. Gelmann testified that the ten-month delay in diagnosis deprived Salazar of a substantial chance of cure. (*Id.* at 170:2–5 (Gelmann).) Specifically, he testified that Salazar had a survival rate of 48 percent in October 2015, at which point the size of the tumor was in the range of 1.9 to 2.1 centimeters, or about "the size of a nickel." (*Id.* at 160:3–6, 160:14, 168:2–4 (Gelmann).) According to Dr. Gelmann, by the time Salazar was diagnosed with Stage III lung cancer in August 2016, the tumor was 6.2 centimeters, or about the size of a small "lime or lemon," and his survival rate had fallen to "12 percent or less." (*Id.* at 160:15–25, 168:4–5 (Gelmann).)

Dr. Saxena testified that Salazar's cancer was Stage III in August 2016, and that if the stage had been lower in October 2015, then Salazar's prognosis back then would have been better. (Trial Tr. at 267:6–8, 269:8–9 (Saxena).) Dr. Saxena was asked on cross-examination whether Salazar's cancer "got better, got worse, or stayed the same" from October 2015 to August 2016, and he responded that the size of the tumor increased, and that Salazar had more symptoms and complications than he had in October. (*Id.* at 267:16–22 (Saxena).) When pressed as to whether Salazar's cancer improved or stayed the same during this period, Dr. Saxena testified that it had not. (*Id.* at 269:11–20 (Saxena).) When asked again whether Salazar's cancer got worse between October 2015 and August 2016, Dr. Saxena insisted that he was "not sure." (*Id.* at 269:22–270:1 (Saxena).) He then testified that it would "definitely" be "better" to diagnose lung cancer at an

earlier stage, and that his position was not that "it makes no difference what stage or when you are diagnosed." (*Id.* at 271:6–11 (Gelmann).)

## IV.   CONCLUSIONS OF LAW

"The FTCA makes the United States liable for certain tort claims, including medical malpractice, committed by federal employees as determined by state law." *Lettman v. United States*, No. 12 Civ. 6696 (LGS), 2013 WL 4618301, at *3 (S.D.N.Y. Aug. 29, 2013) (citing *Taylor v. United States*, 121 F.3d 86, 89 (2d Cir.1997); 28 U.S.C. § 1346). "To establish a claim for medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994) (citations omitted). The plaintiff must prove each of these elements by a preponderance of the evidence. *See Metzen v. United States*, 19 F.3d 795, 807 (2d Cir. 1994). Expert testimony is required to make out these elements, "except as to matters within the ordinary experience and knowledge of laymen." *Milano by Milano v. Freed*, 64 F.3d 91, 95 (2d Cir. 1995) (citations omitted).

Here, the Government concedes that "[t]he applicable standard of care required that Dr. Hessler note the [October 7, 2015] chest x-ray results and the recommended follow-up in the medical chart," and that "[i]f a CT scan of Mr. Salazar's chest had been conducted in October 2015, Mr. Salazar's lung cancer could have been diagnosed at that time." (JPTO § VI, ¶ 13.) Accordingly, the only issue as to liability is whether Plaintiff proved by a preponderance of the evidence that the ten-month delay in the diagnosis of Salazar's lung cancer proximately caused Salazar's injuries and death.

## A. The Delayed Diagnosis Proximately Caused Salazar's Injuries and Death.

In order to establish proximate causation, a plaintiff must demonstrate that the defendant's deviation from the standard of care was "a substantial factor in bringing about the injury." *D.Y. v. Catskill Reg'l Med. Ctr.*, 66 N.Y.S.3d 368, 371 (3d Dep't 2017) (citations omitted). Under the loss-of-chance doctrine, where the plaintiff alleges that the defendant deviated from acceptable medical practice by negligently delaying in diagnosing a condition, "proximate cause may be predicated on the theory that the defendant 'diminished [the patient's] chance of a better outcome or increased the injury.'" *Id.* (alteration in original) (citation omitted); *see also Mi Jung Kim v. Lewin*, 175 A.D.3d 1286, 1288 (2d Dep't 2019) ("[Where] a plaintiff claims that a physician's acts or omissions decreased his or her chances of survival or cure, there is legally sufficient evidence of causation 'as long as the jury can infer that it was probable that some diminution'" in the chance of survival or cure had occurred.'" (citations omitted)). "The doctrine 'permits plaintiffs to recover damages for the reduction in the odds of recovery attributable to a defendant,' even when that reduction is less than fifty percent." *Mann v. United States*, 300 F. Supp. 3d 411, 422 (N.D.N.Y. 2018) (citation omitted). An expert need not "quantify the extent to which the delayed diagnosis . . . diminished the chance of a better outcome or increased the injury," so long as "evidence is presented from which the jury may infer that the defendant's conduct diminished the plaintiff's chance of a better outcome or increased his [or her] injury." *D.Y.*, 66 N.Y.S.3d at 371 (alteration in original) (citations omitted).

The Government argues that Plaintiff cannot meet her burden of proof to show that the ten-month delay in diagnosis was the proximate cause of Salazar's injuries and death because it is not possible to reliably determine the stage of Salazar's lung cancer in October 2015. (Post-Trial Mem. of Law of Def. United States of America ("Govt's Post-Trial Mem."), ECF No. 117, at 3.)

According to the Government, there is insufficient data to make a reliable determination based on the October 7, 2015 x-rays alone, so this Court must "consider all of the possible scenarios"—that is, "that Salazar may have had Stage I, II or III lung cancer in October 2015." (*Id.* at 1.) The Government asserts that the evidence at trial shows that in all of those scenarios, Salazar likely would have faced the same or a similar prognosis and undergone the same or comparable treatment had he been diagnosed ten months earlier. (*Id.* at 1, 5.) Namely, in the Government's view, Salazar likely would have required chemotherapy and/or radiation and would have faced a reduced life expectancy. (*Id.*) Finally, the Government claims that Salazar's paraneoplastic myositis was tied to his cancer, and as such, Plaintiff cannot establish that Salazar would have avoided developing myositis if treatment began in October 2015. (*Id.* at 1–2, 6.)

Contrary to the Government's assertions, the critical question is not whether one can "reliably" determine the stage of Salazar's lung cancer in October 2015, but instead, whether his cancer worsened from October 2015 to August 2016. At trial, the parties presented dueling expert opinions on this key question. Dr. Gelmann testified that based on the October 7, 2015 x-rays, the size of Salazar's tumor in October 2015 was 1.9 to 2.1 centimeters, or about the size of a nickel, (Trial Tr. at 160:3–6, 160:14 (Gelmann)), and that with no indication that the cancer had spread to the surrounding lymph nodes or organs, the stage of Salazar's cancer was Stage I, (*id.* at 161:3–10, 177:16–178:2 (Gelmann)). He further testified that by August 17, 2016, at which point Salazar was diagnosed with Stage III lung cancer, the tumor had tripled in size to 6.2 centimeters, and that Salazar's survival rate had dropped from 48 percent to 12 percent or less. (*Id.* at 160:15–25, 168:2–5 (Gelmann).) Dr. Saxena, on the other hand, refused to state whether Salazar's cancer worsened from October 2015 to August 2016, even after conceding that the cancer neither improved nor stayed the same. (Trial Tr. at 267:16–22, 269:11–270:1 (Saxena).) He did acknowledge, however,

that during this period, the size of the tumor increased, and Salazer began experiencing more symptoms and complications. (*Id.* at 267:19–22 (Saxena).) Dr. Saxena also testified that there was a "good chance" and "good likelihood" that Salazar's cancer was less than Stage III in October 2015. (*Id.* at 250:6–14, 276:22–277:6 (Saxena).)

Faced with such dueling testimony about whether the cancer worsened and based on all of the evidence presented at trial, Dr. Gelmann's testimony was more credible than that of Dr. Saxena. Dr. Gelmann's testimony was consistent with the other evidence at trial. In contrast, Dr. Saxena lost credibility because of his reluctance to admit that Salazar's cancer worsened from October 2015 to August 2016. He struggled with this question, with no good reason, and was not candid with his testimony. He tried to avoid the obvious answer, that given the increase in the size of the tumor, Salazar's increasing symptoms and complications, and the "good chance" that the cancer was less than Stage III in October 2015, the cancer *clearly* worsened during the ten-month period.

Testimony from the other witnesses and the other facts established at trial also lead to the conclusions that Salazar's cancer did, indeed, worsen during the ten-month period, and that Salazar likely had Stage I lung cancer in October 2015. Dr. Myung testified that in October 2015, he could not even see the tumor on one of the two x-ray views, and that the tumor was just an incidental finding. (Trial Tr. at 36:17–24, 37:5–38:2 (Myung).) As NP Glasser testified, during Salazar's visits with her in October 2015 through March 2016, Salazar did not complain about chest pain, shortness of breath, or any other physical problems; his laboratory tests all appeared normal; and he was in "pretty good shape." (Trial Tr. at 66:2–11, 67:5–9, 68:7–14, 71:12–21, 72:17–22, 73:2–4, 76:3–77:1 (Glasser).) Plaintiff described Salazar as being, prior to his diagnosis with lung cancer in August 2016, "fine" and "active." (Trial Tr. at 96:8–11 (Gonzalez).) He ran three miles, exercised at the gym, and danced. (*Id.* at 97:7–98:6 (Gonzalez).) This does not present the picture

14

of a man who had Stage III lung cancer. In short, the evidence does not support the finding that Salazar had an advanced stage of cancer in October 2015. Rather, given the x-rays showing that the tumor tripled in size, the lack of symptoms displayed, and the medical records confirming that Salazar was in "good shape," it is very likely that Salazar's cancer was Stage I at the time.

Because Salazar's lung cancer in October 2015 was very likely Stage I, Salazar would have faced a better prognosis had he been diagnosed at that time. Dr. Gelmann provided statistical evidence that Salazar's survival rate was 48 percent in October 2015, and that he therefore "had a reasonable chance of cure." (Trial Tr. at 166:13–21, 168:2–169:10 (Gelmann).) Although Dr. Saxena did not opine on the exact stage of Salazar's cancer in October 2015, (*see* Trial Tr. at 249:20–250:1 (Saxena)), he agreed that Salazar's prognosis would have been better if the stage had been lower than Stage III at that time and that it would "definitely" be "better" to diagnose lung cancer at an earlier stage, (*id.* at 269:8–9, 271:6–11 (Saxena)). Indeed, Dr. Saxena testified that "[f]or those patients who are treated for clinical stage 1 whose cancer has not upstaged to a higher stage, . . . the rate of recurrence of their cancer . . . can be as high as 40 percent." (*Id.* at 213:19–23 (Saxena).) Presumably then, if a patient is diagnosed and treated early, before his cancer has "upstaged to a higher stage," the likelihood that his cancer will *not* recur would be 60 percent, if not greater.

The evidence at trial also established that Salazar would have undergone different treatment had he been diagnosed in October 2015. As Plaintiff testified, after being diagnosed with Stage III lung cancer, Salazar underwent chemotherapy and radiation. (Trial Tr. at 111:12–24, 116:20–21 (Gonzalez).) Both experts agreed that had Salazar been diagnosed with Stage I lung cancer, however, the standard treatment would have been surgery. (Trial Tr. at 165:18–166:5, 173:1–6 (Gelmann); Trial Tr. at 211:16–24 (Saxena).) Dr. Gelmann also testified that assuming

Salazar's Stage I cancer did not progress, Salazar would have "more likely than not" avoided developing paraneoplastic autoimmune syndrome. (Trial Tr. at 166:16–21 (Gelmann).) Dr. Saxena did not dispute this. Instead, consistent with Dr. Gelmann's opinion, Dr. Saxena testified that Salazar would have been "at risk of developing paraneoplastic syndrome," but only "[i]f [*his treatment*] *was unsuccessful and his cancer was present again or never was able to be removed.*" (Trial Tr. at 225:15–23 (Saxena).) As such, it is clear that had Plaintiff been diagnosed with Stage I lung cancer in October 2015, rather than being subjected to chemotherapy and radiation, he very likely would have only had surgery.

Based on the available documents, testimony, and credibility of the witnesses, Plaintiff has proven by a preponderance of the evidence that the Government's ten-month delay in diagnosing Salazar's lung cancer was a substantial factor in causing Salazar's injuries and death and that absent this delay, Salazar would have had a chance at a better outcome. Plaintiff has thus met her burden of establishing that the delay proximately caused her husband's injuries and death and that the Government is liable for the damages arising from such injuries and death.

**B. Plaintiff Is Entitled to Damages for Pain and Suffering, Loss of Services and Consortium, and Medical and Funeral Expenses.**

"Damages in FTCA actions are determined by the law of the state in which the tort occurred." *Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1081–82 (2d Cir. 1988) (citations omitted). "Courts may award 'fair and just compensation for any injuries proximately caused by the negligence of the Government's employees.'" *Estevez v. United States*, 72 F. Supp. 2d 205, 208 (S.D.N.Y. 1999) (citation omitted). "Generally, under New York law a plaintiff may recover his loss of earnings, medical expenses, and mental and physical pain and suffering." *Ulrich*, 853 F.2d at 1082 (citation omitted).

Here, Plaintiff seeks $6 million in damages for Salazar's estate and $2 million in damages for herself. (Gary A. Barbanel's Letter dated Sept. 19, 2019 ("Pl.'s Post-Trial Mem."), ECF No. 124, at 6.) The Government argues that, to the extent this Court finds the Government liable to Plaintiff and damages are warranted, this Court should award damages of no more than $350,000 for pain and suffering, $10,000 for out-of-pocket medical expenses, and $55,000 for loss of services, for a total of $415,000. (Govt's Post-Trial Mem. at 18.)

### 1. Pain and Suffering.

"[P]ersonal injury awards, especially those for pain and suffering, are subjective opinions which are formulated without the availability, or guidance, of precise mathematical quantification[.]" *Malmberg v. United States*, 816 F.3d 185, 198 (2d Cir. 2016) (quoting *Reed v. City of New York*, 757 N.Y.S.2d 244, 248 (1st Dep't 2003)). "Under New York law, '[t]he measure of damages for pain and suffering and emotional distress is fair and reasonable compensation to be fixed by the trier of fact in the light of all the evidence in the case.'" *Doe v. HRH Prince Abdulaziz Bin Fahd Alsaud, Saudi Oger Ltd.*, No. 13 Civ. 571, 2017 WL 4541426, at *4 (S.D.N.Y. Oct. 10, 2017) (alteration in original) (citation omitted). "[F]actors to be considered in evaluating such awards include the nature, extent and permanency of the injuries, the extent of past, present and future pain and the long-term effects of the injury." *Nolan v. Union Coll. Tr. of Schenectady, N.Y.*, 51 A.D.3d 1253, 1256 (3d Dep't 2008). "Guidance may be found . . . in prior awards involving similar torts, similar injuries, or both." *Grynberg v. City of New York*, No. 08 Civ. 2895 (FB), 2010 WL 2985914, at *5 (E.D.N.Y. July 27, 2010) (citation omitted).

After being diagnosed with lung cancer in August 2016, Salazar lived for two years until his death in August 2018. Prior to his diagnosis, Salazar was social, physically active, and in good shape despite being in his mid-seventies. Following his diagnosis, however, he endured significant

pain and suffering. He experienced shortness of breath, fatigue, loss of appetite, muscle aches and weakening, and voice loss. He underwent 30 rounds of radiation treatment, as well as chemotherapy, which resulted in him losing hair and his appetite. He developed paraneoplastic autoimmune syndrome, which forced him to rely on a feeding tube that was inserted in September 2016 and remained inserted until his death. Plaintiff testified that her husband ultimately could not be left alone, and that on two occasions, he fell while trying to get out of bed.

Determining a monetary figure for an individual's pain and suffering is an unenviable task, but awards issued in comparable New York cases involving failure to diagnosis lung cancer provide some guidance. In *Mann v. United States*, 300 F. Supp. 3d 411 (N.D.N.Y. 2018), a recent FTCA case, a radiologist at the VA negligently failed to identify a suspicious lesion on a chest x-ray, leading to a 38-month delay in diagnosis and then, following the eventual diagnosis, 20 months of pain and suffering by the decedent. The court awarded $1,377,327 in damages, which included $1,250,000 in pain and suffering. In *Mandel v. New York County Public Administrator*, 29 A.D.3d 869 (2d Dep't 2006), which involved a 29-month delay in diagnosis, followed by a period of 26 months before the decedent passed away, the court upheld the jury's award of $2,000,000 in damages for pain and suffering. In *Olsen v. Burns*, 267 A.D.2d 366 (2d Dep't 1999), the defendants' failure to diagnose lung cancer following a chest x-ray resulted in a 17-month delay, followed by 8 months of pain and suffering. *See also Medical Malpractice in Diagnosis and Treatment of Lung Cancer*, 94 A.L.R. 6th 431; *New York Medical Malpractice* § 26:56 (Matthew Gaier & Norman Bard eds., 2020). There, the court found that the jury's $1,146,000 award for pain and suffering was excessive and ordered a new trial unless the plaintiff filed a stipulation consenting to decrease the award to $700,000. Upon reviewing the facts of and damages awarded in these cases, $850,000 is an appropriate award here for Salazar's pain and suffering.

## 2. Loss of Services and Consortium.

Under New York law, the spouse of an injured plaintiff may recover for loss of services and consortium. Specifically:

> [w]here a spouse, prior to injury, performed certain household services for his or [her] other spouse, the latter spouse may recover the pecuniary value of the services that the injured spouse formerly performed[.] By a parity of reasoning, where an injury to a spouse compels the other spouse to perform additional tasks, not previously performed, for the injured spouse, the non-injured spouse may properly recover for the pecuniary value of those additional services.

*Zavaglia v. Sarah Neuman Ctr. for Healthcare & Rehab.*, 883 N.Y.S.2d 889, 892 (Sup. Ct. Weschester Cty. 2009). "The concept of consortium includes not only loss of support or services, it also embraces such elements as love, companionship, affection, society, sexual relations, solace and more." *Rangolan v. Cty. of Nassau*, 370 F.3d 239, 247 (2d Cir. 2004) (quoting *Millington v. Southeastern Elevator Co.*, 22 N.Y.2d 498, 502 (1968)). An award for loss of consortium "is designed to 'compensate for the injury to th[e marital] relationship' and to 'the interest of the injured party's spouse in the continuance of a healthy and happy marital life.'" *Id.* at 248 (alteration in original) (quoting *Millington*, 22 N.Y.2d at 504–05).

Here, the parties stipulated that the amount of any damages for loss of services would be $55,000. (Trial Tr. at 81:8–10). Plaintiff additionally seeks damages for "loss of consortium for 2 years." (*See* Pl.'s Post-Trial Mem. at 5.) Plaintiff does not indicate, however, what amount she is seeking for such loss. Moreover, Plaintiff's counsel did not elicit testimony at trial on the issue of loss of consortium. (*See* Gary A. Barbanel's Letter dated June 25, 2019, ECF No. 113.) Nonetheless, given that Plaintiff was married to Salazar for many decades, an award of $50,000 for loss of consortium, on top of $55,000 for loss of services, is appropriate.

### 3. Medical and Funeral Expenses.

The parties stipulated prior to trial that "Plaintiffs' out of pocket expenses not covered by insurance amount to less than $10,000.00 in [the] aggregate." (JPTO § VI, ¶ 34.) In her post-trial submission, Plaintiff contends that she is also entitled to $367,633.05 for Medicare reimbursement and $10,233.75 for funeral expenses. (Pl.'s Post-Trial Mem. at 5; *see also* Gary A. Barnel's Letter dated Sept. 16, 2019, ECF No. 120.) With respect to the Medicare reimbursement, Plaintiff submitted a March 25, 2019 letter from the Centers for Medicare & Medicaid Services ("CMS") indicating that it had identified $367,633.05 in conditional payments by Medicare that may be subject to reimbursement if Salazar's estate received a settlement, judgment, award, or other payment in connection with Salazar's cancer treatment. (CMS Letter dated Mar. 25, 2019, ECF No. 120-1, at 1.)

The Government does not dispute Plaintiff's request for funeral expenses but argues that Plaintiff's request for $367,633.05 in Medicare reimbursement is improper. (*See* Rachel L. Doud's Letter dated Sept. 19, 2019, ECF No. 123, at 1.) The Government argues, *inter alia*, that Plaintiff was in possession of the CMS letter for nearly six months before submitting it to this Court and has not provided any justification for attempting to introduce, months after trial concluded, evidence of the letter or of Medicare's coverage of Salazar's medical expenses. (*Id.*) The Government also argues that the CMS letter is hearsay because it expressly states that it is "not final" and "IS NOT A BILL," and it instead simply identifies a list of payments that CMS believes are associated with Plaintiff's case. (*Id.*) As the Government also notes, "in the event a patient recovers damages in a case pertaining to a medical issue for which Medicare has paid expenses, CMS does not seek reimbursement from amounts that are allocated by the court to categories of damages other than medical expenses." (*Id.* at 2 (citing *Taransky v. Secretary of U.S. Dep't of*

*Health and Human Servs.*, 760 F.3d 307, 318 (3d Cir. 2014); *Paraskevas v. Price*, 16 Civ. 9696, 2017 WL 5957101, at *5 (N.D. Ill. Nov. 27, 2017)).) In response, Plaintiff states that she has "no objection" to this Court delineating the damages amount, if any, that pertains to medical expenses, so long as "it is clearly understood by [the Government] that any reimbursement is not part of the other items of damages to be awarded and, as in prior cases, the amount of reimbursement is subject to negotiations." (Gary A. Barnabel's Letter dated Sept. 23, 2019, ECF No. 125, at 2.)

Accordingly, Plaintiff is awarded $10,000 for medical expenses and $10,233.75 for funeral expenses.

## V. CONCLUSION

Judgment is entered in favor of Plaintiff and against the Government. Plaintiff is awarded $850,000 for Salazar's pain and suffering, $55,000 for loss of services, $50,000 for loss of consortium, $10,000 for medical expenses, and $10,233.75 for funeral expenses, for damages in the total amount of $975,233.75.

Dated: New York, New York
     March 31, 2020

SO ORDERED.

_George B. Daniel_
GEORGE B. DANIELS
United States District Judge